**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ROBERT GRAYER and BRIAN MORTON, | ) | CASE NO. 1:16-cv-1382 |
| on behalf of themselves and all others | ) | |
| similarly situated, | ) | JUDGE CHRISTOPHER BOYKO |
| | ) | |
| Plaintiffs, | ) | MAGISTRATE JUDGE PARKER |
| | ) | |
| v. | ) | |
| | ) | **BRIEF IN SUPPORT OF** |
| KENNAMETAL INC. | ) | **DEFENDANT'S MOTION TO** |
| | ) | **DECERTIFY FLSA** |
| Defendant. | ) | **COLLECTIVE ACTION** |

**BRIEF IN SUPPORT OF DEFENDANT'S MOTION**
**TO DECERTIFY FLSA COLLECTIVE ACTION**

# TABLE OF CONTENTS

**Page**

I.     SUMMARY OF ARGUMENT ............................................................... 2

II.    RELEVANT FACTS ........................................................................... 4

      A.      Kennametal's Orwell Manufacturing Facility ...................................... 4

            1.      Orwell Manufactures Tungsten Carbide Inserts ......................... 4

            2.      Orwell's Management Structure ................................................ 4

            3.      Orwell's Various Departments ................................................. 5

                     a.      The Pressing Department ................................................. 6

                     b.      The Periphery Grind Department.................................... 8

                     c.      The Mill 1 Department................................................... 9

                     d.      The Coating Department (CVD/PVD)............................. 9

                     e.      The Quality and Inspection Department ....................... 11

                     f.      The Mark, Pack, and Lid Department........................... 11

                     g.      The Material Shipping Department ............................... 11

                     h.      The Maintenance and Tool Room Department............................ 12

      B.      Kennametal's Policies And Procedures Regarding Timekeeping And Breaks ........................................................................................ 12

      C.      The Temporary Shift Overlap.......................................................... 13

III.   PROCEDURAL POSTURE .................................................................... 14

IV.   ARGUMENT...................................................................................... 15

      A.      Plaintiffs Are Unable To Identify A Policy Or Practice Common To All Plaintiffs And Opt-Ins, That, If Proved, Would Demonstrate That Kennametal Violated The FLSA .......................................................... 15

            1.      The Alleged Policies Did Not Apply To All Plaintiffs And Opt-Ins........ 15

            2.      A Shift Overlap Is Not An Unlawful Practice Under The FLSA ............. 17

            3.      The 20-Minute Paid Meal Period Was A Bona Fide Meal Period .......... 17

4.      The Unpaid Break Did Not Violate The FLSA ......................................... 21

B.      The Viability Of Each Plaintiff's And Opt-In's Claims Depends On His Or Her Individual Factual Circumstances And Employment Settings ................. 23

1.      Comparison Of Opt-Ins................................................................. 24

2.      Not All Opt-Ins Were Subject To The Shift Overlap .............................. 26

3.      Plaintiffs And Opt-Ins Had Diverse Job Duties........................................ 26

4.      The Salaries, Overtime, And Shift Premium Received By Opt-Ins Varied...................................................................................... 27

5.      Each Opt-In Had Different Managers, Supervisors, And Team Leads ...................................................................................... 28

C.      Kennametal's Defenses To Each Plaintiff's And Opt-In's Claims Must Be Litigated And Analyzed On An Individual Basis .................................. 29

1.      The Twenty (20) Minute Shift Overlap Is Offset By The Paid Meal Period And Shift Premium Pay Must Be Determined On An Individualized Basis...................................................................... 30

2.      Kennametal's Knowledge, Plaintiffs Failure to Follow Procedures, And *De Minimis* Time Must Be Determined On An Individualized Basis............................................................... 31

3.      Plaintiffs And Opt-Ins Credibility Must Be Determined On An Individualized Basis............................................................... 31

D.      Fairness And Procedural Factors Dictate That The Class Be Decertified ........... 32

V.      CONCLUSION............................................................................ 33

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Camilotes v. Resurrection Health Care Corp.*,
   286 F.R.D. 339 BL 259293 (N.D. Ill. 2012)............................................................34

*Cornell v. World Wide Bus. Servs. Corp.*,
   2015 BL 360710 (S.D. Ohio Nov. 02, 2015)..........................................................20

*England v. New Century Financial Corp.*,
   370 F. Supp. 2d 504 (M.D. La. 2005)....................................................................38

*Espinoza v. Cty. of Fresno*,
   290 F.R.D. 494 BL 80154 (E.D. Cal. 2013) ...........................................................34

*Frye v. Baptist Mem. Hosp., Inc.*,
   2010 WL 3862591 (W.D. Tenn. Sept. 27, 2010),
   *aff'd* 495 App'x 669 (6th Cir. 2012).............................................................22, 28

*Garcia v. Tyson Food*,
   766 F. Supp.2d 1167 (D. Kan. 2011) .....................................................................26

*Gates v. Rohm & Haas Co.*,
   655 F.3d 255 (3d Cir. 2011)....................................................................................37

*Herman v. Palo Group Foster Home, Inc.*,
   183 F.3d 468 (6th Cir. 1999) ..................................................................................26

*Mitchell v. Greinetz*,
   235 F.2d 621 (10th Cir. 1956) ................................................................................26

*Monroe v. FTS USA LLC*,
   763 F. Supp. 2d 979, 996, (W.D. Tenn. 2011),
   *aff'd in part*, 2016 BL 62349, at *6 (6th Cir. 2016) ............................................37

*Myracle v. Gen. Elec. Co.*,
   1992 WL 699863 (W.D. Tenn Dec. 1, 1992) aff'd, 33 F.3d 55 (6th Cir. 1994) ....................25

*Ruffin, et al. v. MotorCity Casino*,
   2014 WL 11309796 (E.D. Mich. March 10, 2014),
   *aff'd* 775 F.3d 807 (6th Cir. 2015)...................................................24, 25, 26, 35

*White v. Baptist Mem'l Health Care Corp.*,
   2011 WL 1883959 (W.D.Tenn. May 17, 2011),
   *aff'd*, 699 F.3d 869 (6th Cir. 2012).............................................................20, 22, 28

**Statutes**

29 U.S.C.A. § 207 ................................................................................................35

29 U.S.C. §§ 201-19 ...........................................................................................19

29 U.S.C. § 207(e)(5-7) ..................................................................................26, 35

29 U.S.C. § 207(h)(2) .....................................................................................26, 35

**Regulations**

29 C.F.R. § 785.18 ..............................................................................................26

Plaintiffs, current manufacturing workers of Defendant Kennametal Inc. ("Kennametal" or "Defendant"), claim that they worked at Kennametal's Orwell Facility without receiving proper compensation, and assert claims against Kennametal under the Fair Labor Standards Act ("FLSA").  The case has proceeded through discovery, with the parties centrally focused on determining whether the FLSA collective action should remain certified.  An additional 191 hourly workers form the Orwell facility opted to join the case as plaintiffs (hereinafter, the "Opt-Ins").  Kennametal has moved to decertify the conditionally certified FLSA action because Plaintiffs cannot establish that they and all Opt-Ins are similarly situated.  If the Court grants Kennametal's motion, the Opt-Ins will be dismissed from this action.  Kennametal respectfully suggests it would be appropriate for the Court to provide any dismissed Opt-Ins with a window of 30 calendar days within which to file an individual action if they so choose, with the statutory limitations period governing their FLSA claims to be tolled during the 30 days.

Kennametal respectfully requests that the Court grant its motion for the following reasons:

First, Plaintiffs cannot identify a *common* and *unlawful* policy or practice that could resolve the claims for unpaid wages, including overtime, for all Plaintiffs and Opt-Ins.  The extensive discovery in this case has revealed that the only practice common to most (but not all) Plaintiffs and Opt-In Plaintiffs is a lawful shift overlap practice, which was implemented at the Orwell facility for a limited period of time.  This temporary, lawful practice did not impact all Opt-Ins, and is insufficient to bind the disparate claims in one collective action.

Second, Plaintiffs cannot identify a common theory that would enable the issues of liability or damages to be determined on a common basis for all Plaintiffs and Opt-Ins.  To the contrary, discovery has confirmed that Plaintiffs' and Opt-Ins' unpaid wage and overtime claims

depend on questions that must be analyzed based on Plaintiffs' and Opt-Ins' individual factual circumstances (*i.e.*, whether he or she was subject to a shift overlap, what his or her scheduled breaks were, whether he or she took all scheduled breaks, whether such breaks were uninterrupted, and whether he or she ever failed to report any missed breaks.)

Third, Kennametal's defenses to each Plaintiffs' and Opt-Ins' unpaid wage and overtime claims depend on legal and factual issues that are specific to each individual Plaintiff or Opt-In. Such individualized defenses include whether Plaintiffs' and Opt-Ins' alleged unpaid work is compensable, whether Kennametal is entitled to any offset for hours for which Plaintiffs and Opt-Ins were paid but did not work, and whether each Plaintiff's or Opt-In's alleged unpaid wage and overtime work is *de minimis*.

Finally, Plaintiffs' and Opt-In's claims cannot be adjudicated collectively in a fair and efficient manner. Since Plaintiffs and Opt-Ins admit that they have no knowledge about the circumstance of other workers, trial of this matter would require presentation of evidence regarding the claims and defenses of the Plaintiffs and Opt-Ins on an individual basis, or in some cases perhaps in small subsets. Such a trial would be inherently inefficient. Whatever a jury must decide with respect to one Plaintiff or Opt-In, or even to a small subset, resolves nothing as to all others.

## I.     SUMMARY OF ARGUMENT

Kennametal moves for decertification because the Plaintiffs and the Opt-Ins are not similarly situated. This conclusion is supported by four independent reasons.

### 1.     Plaintiffs and the Opt-Ins are not similarly situated with respect to a policy that applied to everyone and violated the FLSA.

To proceed as a collective, Plaintiffs must show that Kennametal had a common policy that violated the FLSA. Plaintiffs' sole claim arises from a temporary practice that Kennametal implemented at its Orwell Facility, which required hourly employees to report to work for a shift that lasted 20 minutes longer than

what they were accustomed (the "shift overlap"). Plaintiffs claim under this new regime, that they were only paid for 8 hours of work although they actually worked 8 hours and 20 minutes. Contrary to Plaintiffs' contentions, the shift overlap "policy" did not apply to all Opt-Ins. And the remaining Plaintiffs and Opt-Ins who were subject to the shift overlap "policy" have not, and cannot, demonstrate that this purported policy was unlawful and violated the FLSA.

2. **Plaintiffs and the Opt-Ins are not similarly situated with respect to their relevant working conditions.**

There is material and substantial disparity within the proposed collective with respect to Plaintiffs' and Opt-Ins' job duties, wages, overtime hours, supervisors, schedules, and circumstances relating to breaks. The wage and hour claims must be analyzed based on each Plaintiffs' and Opt-In's individual factual circumstances. The proposed collective includes workers from 12 departments and sub-departments, over 20 job positions, and the operation of at least 19 different machines. As such, trial would require testimony from at least 29 department managers, supervisors and leads.

3. **Plaintiffs and the Opt-Ins are not similarly situated with respect to the substance of their wage and hour claims, nor as to Kennametal's defenses.**

Plaintiffs' and Opt-Ins' claims are not uniform. Some claim they were not paid for work at the start of their shift. Others claim they were not paid during uninterrupted meal or rest periods. Still others claim they were interrupted during unpaid meal or rest periods. Critically, some Opt-Ins were not even subject to the particular practices being challenged in this case. Naturally, the disparate nature of Plaintiffs' claims triggers highly individualized defenses.

4. **Plaintiffs and the Opt-Ins are not similarly situated with respect to the proof required to determine liability and/or damages.**

Because of the individualized nature of their claims, and defenses, allowing this to proceed as a collective would impose extraordinary burdens on the Court and on a jury. The claims at issue must be addressed on a worker-by-worker basis, including, whether each worker received a paid or unpaid break, missed all or part of their break(s), failed to follow established practices and procedures for reporting missed break times, worked a *de minimis* amount of overtime, were paid for non-compensable meal periods and for premium shifts or days, and could be subject to an offset if an unpaid break was missed or interrupted but a paid break during the same shift was uninterrupted. This case would require adjudication through countless "mini-trials," which is inefficient and inconsistent with the purpose of an FLSA collective trial.

For the foregoing reasons, Kennametal respectfully requests that this Court decertify the

collective action and dismiss all of the Opt-Ins' FLSA claims.

- 3 -

## II.     RELEVANT FACTS[1]

### A.     Kennametal's Orwell Manufacturing Facility

#### 1.     Orwell Manufactures Tungsten Carbide Inserts

Kennametal manufactures tungsten carbide inserts at its Orwell, Ohio Facility ("Orwell")

pursuant to customer orders.[2]  For each order, the customer specifies the size and style of the

insert (from more than 20 styles)[3] and the volume.[4]  The Orwell crew then presses, sinters,

grinds, and coats the inserts pursuant to the customer's order.[5]  From start to finish, the inserts

generally proceed through each of Orwell's seven main departments: (1) Pressing, (which

includes pressing, tip set, sintering, Vargas, and die crib); (2) Periphery Grind; (3) Mill 1;

(4) Coating; (5) Quality and Inspection; (6) Mark, Pack and Lid;  and (7) Shipping.[6]  Orwell also

has a Maintenance Department, which is not involved in the manufacturing process.[7]

#### 2.     Orwell's Management Structure

During the relevant time period[8] Orwell's management hierarchy was composed of a

plant manager, value-stream managers, front-line supervisors, and team leads.

**Plant Managers and Value-Stream Managers.**  The managers oversaw the entire

facility.  Three value-stream managers were designated to cover various departments, broken out

as follows:  pressing and sintering manager, periphery grind/Mill 1 manager, and pre/post-coat

---

[1] All exhibits cited herein are included in the Appendix in Support of the Motion to Decertify FLSA Collective Action.
[2] Jackson Dep. at 28:23-29:7; Klotz Dep. at 20:15-21.
[3] Jackson Dep. at 30:22-31:4; DeCapito Dep. at 18:13-18.
[4] Jackson Dep. at 30:22-31:4.
[5] Klotz Dep. at 20:10-13.
[6] Klotz Dep. at 23:12-13.
[7] Klotz Dep. at 27:24-25.
[8] References to the "relevant time period" mean the period January 2014 to June 2016.  *See,* Klotz Dep. at 116:11-15.

and coating manager.[9]  The managers' responsibilities included daily production reporting, daily management of the production department, and coordinating manpower.[10]

**Front-line Supervisors**.  The front-line supervisors reported to the value-stream managers.[11]  Each front-line supervisor was responsible for a particular department and his or her responsibilities included ensuring that timekeeping, safety, and quality control measures were met, as well as handling employee discipline.[12]  Front-line supervisors were not present in every department during every shift.[13]

**Team Leads.**  Team leads were assigned to serve as a resource for shifts where a particular department did not have a supervisor present during the shift.[14]  Team leads responsibilities included conducting lead-board discussions, which included communicating the prior shift's production numbers, the current shift's production goals, and statements regarding safety.[15]  Unlike the front-line supervisors, team leads' duties did not include employee discipline.[16]

### 3.    Orwell's Various Departments

Each of the departments at Orwell played a key role in producing the tungsten carbide inserts.  From department to department, the roles differed, the machine in which the workers used differed, the training the workers underwent to operate the applicable machinery differed, and management who oversaw the work differed.[17]  Each are addressed in turn.

---

[9] Klotz Dep. at 116:16-25.
[10] Klotz Dep. at 118:11-17.
[11] Klotz Dep. at 118:23-25.
[12] Kovach Dep. at 22:9-13.
[13] Jackson Dep. at 97:2-9.
[14] *Id.*
[15] Kovach Dep. at 11:9-18.
[16] Kovach Dep. at 11:23-25.
[17] Crites Dep. at 48:24-49:3 (the positions she held were different); Gilmore Dep. at 43:13-44:5 (same); DeCapito Dep. at 47:23-48:1; 56:20-22; 57:15-18 (all positions within the plant are different); Demchak Dep. at 19:13-16; 22:10-18; 35:4-7 (generally, all positions are different and require specific training); Jackson Dep. at 26:16-24; 27:11-13 (same); Mancini Dep. at 18:8-12 (the positions he has held are different); Morton Dep. at 79:1-12 (same);

### a.        The Pressing Department

The Pressing Department is the first step in the manufacturing process.  The Pressing Department workers use a variety of machines with differing style types to press the insert into a soft green state.[18]  Each machine uses different molds for each type of insert which is dictated by the customer's order.[19]  This department is divided into five sub-departments:  pressing, tip setting, sintering, Vargas, and die crib.[20]  The sub-departments each have multiple, different positions, including:  press setup, press operator, furnace operator, tip setter, sinter separator, die crib attendant, die crib coordinator, die crib technician, and powder coordinator, all of which require unique skill sets and training.[21]  Approximately ten to twelve workers per each 8-hour shift work in the Pressing Department.[22]

**Pressing.**  The pressing sub-department  consists of two positions:  press setup and press operator.[23]  The press setup worker places the appropriate die in the appropriate machine (the NC press, the GPA/picker press, or the hand press[24]) and ensures that the size and weight meet the targets.[25]  The press setup worker's responsibilities vary depending on the machine the worker is operating.[26]  The press operator, an entry level position, only runs the press.[27]

**Tip Setting.**  The tip setting department only has one position—a tip setter.  Tip setters do not use machines, and engage in a "very different process than machine press operators."[28]

---

Roni Miller Dep. at 26:12-16; 28:15-20; 38:11-14 (generally all positions are different and require different training); Ritter Dep. at 21:18-22:11 (press operator and grinder positions are different and require different training)
[18] Jackson Dep. at 63:13-64-3; 67:8-11; Klotz Dep. at 51:17-24.
[19] Jackson Dep. at 64:6-17.
[20] Klotz Dep. at 64:11-14; 85:1-2.
[21] Jackson Dep. 67:2-7; 72:7-10; Klotz Dep. at 66:5-8; 79:14-23.
[22] Jackson Dep. at 65:7-17; 66:11-24.
[23] Klotz Dep. at 70:5-13.
[24] Klotz Dep. at 74:7-13.
[25] Klotz Dep. at 71:3-11.
[26] Klotz Dep. at 71:21-72:5; 72:12-15 (the NC press is operated by a computer program whereas the hand press is set up mechanically).
[27] Klotz Dep. at 72:24-73:24.
[28] Klotz Dep .at 77:7-78:18.

Tip setting is a highly specialized skill requiring the right amount of pressure to gently break off the flashing without damaging the insert [29] After the insert is pressed, the tip setters clean the inserts by hand, brush off the excess flashing and check for defects.[30]

**Sintering.**  The insert next goes through the sintering process which heats the insert until it becomes as dense as steel.[31]  The sintering process is effectuated by using one of ten different sintering furnaces.[32]  The insert remains in the furnace anywhere from few hours to overnight, depending on customer specifications.[33]  Furnace operators run the furnace—one furnace per operator per shift.[34]  The furnace operator loads the furnace, downloads the appropriate program, monitors the furnace, responds to any issues, removes the inserts, and sets them to cool.[35]  The inserts then proceed to the separator who cleans the trays, assembles the order with the corresponding route card (customer order), and sends them to the next department.[36]  There is one sinter separator for each of the three 8-hour shifts.[37]

**Vargas.**  This specialized group focuses exclusively on the specific and unique needs of one client, Vargas.[38]  The Vargas operators use two types of machines (the Blanchard and the double disc grinder) to obtain the specific thickness that Vargas requires.[39]  The Vargas operator receives the custom order, loads the machine, performs an inspection of the inserts during the grinding operation, and unloads the machine when complete.[40] As a final step, the operator

---

[29] Klotz Dep. at 78:20-25.
[30] Jackson Dep. at 67:8-13; Klotz Dep. at 78:2-9.
[31] Klotz Dep. at 65:8-16.
[32] Klotz Dep. at 64:15-20.; Anita White, Answer to Interrogatory No. 1. Examples include the Metaplus Furnace and the Microblaster.
[33] Jackson Dep. at 70:14-16.
[34] Jackson Dep. at 70:23-71:2; Klotz Dep. at 65:21-24.
[35] Klotz Dep. at 66:15-24.
[36] Jackson Dep. at 73:17-20; 75:3-7; Klotz Dep. at 66:5-8.
[37] Jackson Dep. at 73:21-24.
[38] Klotz Dep. at 85:6-10; 85:13-20
[39] Klotz Dep. at 85:13-20.
[40] Klotz Dep. at 87:8-13.

manually packs the orders in specialized packaging just for the Vargas product line, which is not Kennametal's standard packaging.[41]

**Die Crib Attendant, Coordinator, Technician and Powder Coordinator.**  This sub-department includes four unique positions.  The die crib attendant schedules the jobs to be performed in Pressing, prepares a kit of tools needed for each job, checks in and receives the tools used by the press setup and inspects tools for damage.[42]  The die coordinator tracks all die repairs and damage, and creates repair purchase orders for die vendors.[43]  The die technician performs a characterization of any new dies by determining how the die performs in the presses.[44]  Finally, the powder coordinator manages the inventory of powders and ensures that the powder batches do not get mixed.[45]  After the pressing process, depending upon the customer's orders, the inserts proceed to the Periphery grinding, Mill 1, or Coating departments.[46],[47]

### b.    The Periphery Grind Department

The Periphery Grind department grinds the outer edge of the inserts to meet customer size specifications.[48]  The periphery grind machine workers operate, on average, two machines per shift including the Waida, Wendt, Myford, waxing, and surface grinding machines.[49]  These machines are unique and require specialized skills.[50]  The grind operators download the grinding program, perform an inspection of the first piece to ensure that the machine is grinding the piece to the size needed, and then run the order through the machine.[51]  Top and bottom operators use

---

[41] Klotz Dep. at 87:13-16.
[42] Klotz Dep. at 81:17-82:4.
[43] Klotz Dep. at 83:12-14.
[44] Klotz Dep. at 83:17-24.
[45] Klotz Dep. at 83:25-84:6.
[46] Jackson Dep. at 82:2-6.
[47] Jackson Dep. at 76:13-17
[48] Klotz Dep. at 28:13-18.
[49] Klotz Dep. at 30:13-17; 32:15-18
[50] Klotz Dep. at 38:2-12.  For instance, the Waida machine is automated and requires different skills than the manually operated Myford.  Klotz Dep. at 38:2-12; see generally Klotz Dep. at 128:5-134:18.
[51] Klotz Dep. at 35:12-36:5.

the Stahli machine to grind the top and bottom of the insert in accordance with blueprint specifications.[52]  Once the grinding process is complete, the operator either places the insert in packaging or places it on a tray to go to the next operation.[53]

### c.    The Mill 1 Department

Mill 1 consists of approximately eight to ten operators per eight-hour shift.[54]  The Mill 1 operators use the Agathon and Oasis machines to grind and hone the inserts.[55]  Mill 1 also polishes the inserts depending on the customer's order.[56]  In addition, Mill 1 workers perform inspections of the inserts using either a microscope or a computer.[57]

### d.    The Coating Department (CVD/PVD)

Inserts that require pre-coating or post-coating proceed to the Coating Department.  The Coating Department generally runs three 8-hour shifts with approximately six operators per shift.[58]  There are numerous processes in the coating department, including setting up the machines; separating, washing, and electropolishing the inserts; coating the inserts; and micro dryblasting the inserts.[59]  Different operators with different skill sets perform these tasks.[60]  The customer order specifies which type of coating is needed.

**Pre-Coating.**  Pre-coating workers operate the Vaqua, Vapormatt and Sabre brush honing machines.[61]  Vaqua operators work both independently and in conjunction with the honing operators.[62]  Separately, a different worker finds the rod and spacer needed, based upon

---

[52] James Dep. at 14:21-22; Klotz Dep. at 40:8-11.
[53] Ritter Dep. at 21:1-6.
[54] Jackson Dep. at 76:21-25.
[55] Klotz Dep. at 48:9-13; 48:14-22; James Dep. at 15:21-23; Crites Dep. at 43:10-16; Jackson Dep. at 80:14-21
[56] Jackson Dep. at 79:17-23.
[57] Jackson Dep. at 78:14-20.
[58] Jackson Dep. at 82:10-17.
[59] Klotz Dep. at 89:4-8.
[60] Jackson Dep. at 83:20-22; 83:24-84:3; Demchak Dep. at 25:15-26:2
[61] Klotz Dep. at 53:13-18.
[62] Klotz Dep. at 55:10-18

the customer order, pulls the newly coated inserts from the machines and places them on the appropriate rod.[63]

**Post-Coating.**  Post-coating workers operate the Blanchard grinders, Berney polisher, Ken Blast Unit ("KBU"), and the Vapormatt Tiger.[64]  The KBU machine requires an operator to set up the blaster for a particular insert, pick the appropriate powder grade for the existing coating on the insert, and run the machine which blasts the coating down to different levels in order to strengthen the insert.[65]  The Vapormatt Tiger is an automated system that processes trays instead of individual parts.[66] The Vapormatt Tiger operator loads the trays at the front of the machine, flips the inserts, runs those trays back through the machine and then inspects the color of the inserts.[67]  The Blanchard operator hand loads and unloads parts, and completes inspections.[68]  The Berney Polisher is run manually by the operator who places a diamond paste polish on the inserts.[69]  The Berney operator retrieves the work order, looks at the requirements for the order, and sets the machine parameters and size.[70]

**PVD and CVD Coating**.  This sub-department consists of setup operators, furnace operators, wash operators, separators, and electropolisher positions.[71]  PVD coating is performed in a separate and distinct work space.[72] PVD coating workers identify and inspect the inserts, verify with the route card that they are working with the right inserts, check the radius of the insert to determine the rod or spring that is going to be used, all with the purpose of making sure

---

[63] Crites Dep. at 35:6-10.
[64] Klotz Dep. at 53:24-54:3.
[65] Crites Dep. at 29:5-18.
[66] Klotz Dep. at 61:11-16.
[67] Klotz Dep. at 61:17-22.
[68] Klotz Dep. at 59:11-14.
[69] Klotz Dep. at 59:22-60:4.
[70] *Id.*
[71] Klotz Dep. at 90:24-91:1; 94:13-18.
[72] Demchack Dep. at 25:15-26:2.

the inserts are set for the appropriate coating furnace.[73]  Unlike PVD operates, CVD operators do not use machines.[74]  Once the inserts are removed from the coating furnaces, they are placed back into trays by separators in the coating department.[75]  The separators ensure that the order has the correct route card and the correct number of inserts.[76]

### e.  The Quality and Inspection Department

At this stage in the process, a certification inspector inspects and certifies the order by looking at sample preparation, dimensional inspections, metallurgical inspections, and maintain the gauges and different instruments inside the plant.[77]

### f.  The Mark, Pack, and Lid Department

Once the inserts are finished, they proceed to the Mark, Pack, and Lid Department.  The workers in this department place the inserts on a conveyor belt, use the route card to mark the correct powder grade, place the inserts in labeling packages, prepare them for shipment the customer, and load the inserts on the delivery truck.[78]  There are three 8-hour shifts with approximately eight employees per shift.[79]

### g.  The Material Shipping Department

After the customer orders have been packaged, the workers in the Material Shipping Department confirm the paperwork, individually pack shipments for both interstate and international delivery, create required delivery notes, and print UPS paperwork.[80]  In addition, the department receives any shipments on the dock, and helps organize them.[81]

---

[73] *Id.*
[74] Klotz Dep. at 90:22-91:1.
[75] Jackson Dep. at 85:21-86:11.
[76] Jackson Dep. at 87:5-10.
[77] Roth Dep. at 59:4-17; Klotz Dep. at 100:5-12.
[78] Jackson Dep. at 88:6-20; 91:25-92:2.
[79] Jackson Dep. at 91:5-17.
[80] Klotz Dep. at 108: 8-18; 109:21-22.
[81] Klotz Dep. at 108:19-22.

### h.    The Maintenance and Tool Room Department

The maintenance and tool room department is not involved in the manufacturing of

inserts.  Instead, these workers maintain the various machines throughout the plant.[82]

## B.    Kennametal's Policies And Procedures Regarding Timekeeping And Breaks

Kennametal maintains an Orwell Employee Handbook which sets forth, among other

policies, the Time Clock Procedures which its employees are required to follow.[83]  Specifically,

the Time Clock Procedures regarding missed break periods states in relevant part:

> Employees are not required to punch in and out for scheduled,
> unpaid break periods (if applicable).  ***However, if an Employee is
> not able to take or complete a full scheduled, unpaid break
> period; he or she must notify the appropriate
> Supervisor/Manager immediately.  A Missed Punch Form[84] must
> be completed and submitted within 24 hours so that the
> Employee's time may be appropriately corrected by the
> Supervisor or Manager.***

> Employees are not required to punch in and out for scheduled, paid
> break or meal periods.

> ***If an Employee discovers that there is an error in his or her pay
> check, it should be immediately reported to his or her
> Supervisor/Manager as soon as possible so that any necessary
> corrections may be made.[85]***

The Orwell employees work a shift schedule.  The shift schedule for Monday through

Friday for 8-hour shifts was:  7:00 a.m. to 3:00 p.m.; 3:00 p.m. to 11:00 p.m.; and 11:00 p.m. to

7:00 a.m.[86]  This schedule applies to the majority of the departments.  Some departments,

however, have 12-hour shifts.[87]  Each shift receives a meal break and rest break.[88] Employees on

---

[82] Klotz Dep. at 103:15-21.
[83] Grayer Deposition Exhibit 4 at page 92.
[84] *See e.g.,* Jackson Dep. Exhibit 4.
[85] Grayer Deposition Exhibit 4 at page 94.
[86] Klotz Dep. at 120:21-25.
[87] Klotz Dep. at 120:21-25; Roni Jo Miller Dep. at 56:10-57:4; 62:4-21.
[88] Grayer Dep. at 66:23-67:3; 74:15-20.

the 12-hour shift receive an additional third break.[89]  Given the nature of the business, the workers have flexibility in when they take their breaks or meal breaks.[90]  During the relevant time period, employees did not clock out for breaks.[91]

## C.    The Temporary Shift Overlap

In or around July 2014, Orwell implemented a 20-minute shift overlap, which remained in effect until June 19, 2016.[92]  The purpose of the shift overlap was to increase productivity and safety through an exchange and discussion of information between workers during the overlapping shifts.[93]  These conversations took place before the employees on the in-coming shift began operating the equipment.[94]  As former team-lead Christine Kovach ("Kovach") testified, the shift overlap helped with the efficiency of the facility.[95]  For example, it was a good way for her as a lead to make sure the equipment was running properly before the start of the shift.[96]  During the 20 minute shift overlap, employees had one paid 20 minute lunch period and one unpaid 20 minute break.[97]

Prior to the implementation of the 20-minute shift overlap, in or around April 2014, the Department of Labor ("DOL") conducted an on-site audit at Orwell regarding timekeeping and pay procedures.[98]  During the DOL audit, Kennametal discussed with the DOL Investigator the possible implementation of the 20-minute unpaid break period, and the Investigator gave no indication that such a practice, if implemented, would be unlawful.[99]  Although the DOL

---

[89] Gilmore Dep. at 60:21-25.
[90] *See, e.g.,* Mancini Dep. 79:5-16.
[91] Gambatese Dep. 26:4-14; Kovach Dep. at 14:5-8.
[92] Gambatese Dep. 31:12-22.
[93] Gambatese Dep. 36:11-37:18.
[94] *Id.*
[95] Kovach Dep. at 19:12-14.
[96] Kovach Dep. at 19:2-9.
[97] Kovach Dep. at 16:4-21.
[98] Gambatese Dep. at 20:15-21.
[99] Gambatese Dep. 39:17-40:3

Investigator did not provide any written recommendations or findings, he concluded that there were no violations with respect to the practices in place at that time, and therefore, no necessity for back pay assessment.[100]

### III.    PROCEDURAL POSTURE

This is a conditionally-certified collective action in which two named plaintiffs and 191 opt-in plaintiffs assert that they were not paid for all hours worked in accordance with the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201-19.  Plaintiffs' claims concern the 20-minute shift overlap described above, which they assert was unpaid work time.[101]

On September 13, 2016, the Court granted Plaintiffs' motion for conditional certification and ordered the parties to submit proposed language for notification and consent forms to be issued to potential opt-in plaintiffs.  *See Dkt. No. 48.*  On October 3, 2016, the Court approved the parties' proposed notice and consent forms, and incorporated them into its Order.  *Dkt. No. 59.*  The notice was directed to "all current and former hourly employees of Kennametal Inc. ("Kennametal") who worked at Kennametal's facility in Orwell, Ohio between January 2014 and June 2016 and who were subject to a 20-minute early start work schedule."  *Dkt. No. 55-1.*

This Court-facilitated notice was sent to approximately 360 individuals about their opportunity to join this action as party plaintiffs.  When individuals filed consent forms in this action, they became party plaintiffs to the FLSA claim based on the alleged 20-minute early start work schedule.

The parties engaged in extensive fact discovery, including taking deposition testimony from 21 witnesses and the production of over 75,000 documents, consisting of over 250,000

---

[100] Gambatese Dep. 40:17-23.
[101] Complaint, ¶¶ 22-32.

pages.  Despite this extensive discovery, Plaintiffs cannot identify a common, unlawful policy or practice giving rise to the disparate FLSA claims.

## IV.     ARGUMENT

To proceed as a collective, Plaintiffs must establish that Opt-Ins are similarly situated. *White v. Baptist Mem'l Health Care Corp.,* 2011 BL 130607, 4, 2011 WL 1883959 (W.D.Tenn. May 17, 2011) *aff'd*, 699 F.3d 869 (6th Cir. 2012).  "[P]laintiffs are similarly situated when they suffer from a single, FLSA-violating policy, and when proof of that policy or of conduct in conformity with that policy proves a violation as to all the plaintiffs."  *Cornell v. World Wide Bus. Servs. Corp.*, 2015 BL 360710, 3 (S.D. Ohio Nov. 02, 2015) (decertifying class).

**A.**     **Plaintiffs Are Unable To Identify A Policy Or Practice Common To All Plaintiffs And Opt-Ins, That, If Proved, Would Demonstrate That Kennametal Violated The FLSA**

Plaintiffs cannot get past square one: the only policy or practice common to all Plaintiffs and Opt-Ins is Kennametal's timekeeping policy that requires employees to record all hours worked and advise their supervisors if they miss some or all of their scheduled breaks.  Plaintiffs will argue that Kennametal's implementation of a temporary shift overlap practice at Orwell, and their claim that the practice caused a failure to pay for all time worked, is sufficient to move forward as a collective.  But this theory fails as a matter of law and fact.

### 1.     The Alleged Policies Did Not Apply To All Plaintiffs And Opt-Ins

As an initial matter, Plaintiffs are unable to show that the shift overlap applied at all relevant times to all Plaintiffs and Opt-Ins.  To the contrary, the deposition testimony of Plaintiffs, discovery Opt-Ins, and managers establishes that whether this alleged policy or practice applied to each Plaintiff or Opt-In differed based on each Plaintiff's or Opt-In's individual factual circumstance.  For example, Opt-In Plaintiff Robert Ritter admitted that he did

not work a shift overlap on the 12 hour-24/7 B shift.[102]  Opt-In Plaintiff Gregory James admitted that as a Production Supervisor he was paid on a salary basis and not subject to the shift overlap from approximately January 2015 to March 2016.[103]  Opt-In Valerie Gambos testified that she was only required to work shift overlap "sometimes."[104]

Plaintiffs' contention that they were not paid for some or all of their breaks is equally unavailing.  To be sure, the extensive discovery in this case establishes that most of the Plaintiffs and Opt-Ins have no idea whether their breaks were paid.[105]  The lead plaintiff, Brian Morton, admitted at deposition that all of his breaks were paid.[106]  This chart summarizes the responses of the 129 Opt-Ins who participated in discovery questionnaires , regarding their individualized views as to whether their rest breaks and meal period were paid for[107]:

| Opt-In Responses Regarding Receiving Paid Rest Break | Number Of Opt-Ins | Opt-In Responses Regarding Receiving Paid Meal Period | Number Of Opt-Ins |
|---|---|---|---|
| Yes | 25 | Yes | 31 |
| No | 15 | No | 7 |
| Don't Know | 75 | Don't Know | 77 |
| No & Don't Know | 5 | No & Don't Know | 1 |
| Yes & Don't Know | 6 | Yes & Don't Know | 12 |
| Sometimes | 1 | Sometimes | 0 |
| Yes & No | 1 | Yes & No | 1 |
| No Response | 1 | No Response | 1 |

---

[102] Ritter Dep. at 18:9-14; 37:8-16.

[103] James Dep. at 45:22-46:2; 87:20-88:16; 46:20-23; 111:15-19; 112:13-114:25.

[104] Valerie Gambos Questionnaire #1.

[105] *See e.g.,* Jackson Dep. at 164:18-23 ("We were paid for the breaks"); Mancini Dep. at 91:14-21; Roth Dep. at 81:13-82:5 ("Q: Do you know whether your breaks were paid or unpaid during the 20-minute shift overlap? A: No, I do not know"); DeCapito Dep. at 77:7-9; Demchak Dep. at 56:21-24; Grayer Dep. at 57:10-25; Morton Dep. at 43:6-44:20.

[106] Morton Dep. at 25:4-7.

[107] See Exhibit containing Compilation of Opt-In Responses to Questionnaires.

### 2.    A Shift Overlap Is Not An Unlawful Practice Under The FLSA

Even assuming that the shift overlap applied to all Plaintiffs and Opt-Ins—which it did

not—there is nothing unlawful about Kennametal's 20-minute shift overlap.  First, because a

shift overlap is a lawful practice, Plaintiffs and Opt-Ins must produce substantial evidence of a *de

facto* practice that circumvented the law.  *White,* 2011 WL 1883959, at *9; *Frye,* 2010 WL

3862591, at *3 (court decertified "automatic deduction" collective action in the context of

hospital breaks).  Even assuming that Named Plaintiffs and Opt-Ins were on the clock for 8 hours

and 20 minutes, they were compensated for all time worked in accordance with the FLSA.  As

discussed more fully below, the additional 20 minutes of time was a bona fide meal period which

Kennametal was not obligated to pay pursuant to the FLSA and the DOL regulations.

Furthermore, Opt-Ins testified that, with the exception of the shift overlap, during their

employment with Kennametal, they received compensation for all hours worked, including

overtime.[108]  Additionally, if an Opt-In ever had an issue regarding pay and advised Kennametal

of this issue, the issue was resolved to their satisfaction.[109]

### 3.    The 20-Minute Paid Meal Period Was A Bona Fide Meal Period

All Orwell employees were given a 20 minute *paid* meal period, even though Kennametal

was not required to pay the employees for this time.  As such, Kennametal may offset this

overpayment against any unpaid wages claimed to be due.

As a preliminary matter, the Department of Labor (DOL) has directly acknowledged that

meal periods less than 30 minutes are not a violation of the FLSA.  Specifically, the DOL has set

---

[108] *See e.g.,* Morton Dep. at 107:3-7; 111:5-10; Miller Dep. at 47:11-13.
[109] *See, e.g.,* Roth Dep. at 21:1-19; 22:3-16; 75:7-23; Jackson Dep. at 126:25-128:16.

out the following factors that should be considered in determining if a meal period of less than

30 minutes is appropriate:

> (a)   There are no, or sporadic and minimal, work-related interruptions to the meal period;
>
> (b)   Employees have sufficient time to eat a regular meal ("Periods less than 20 minutes should be given special scrutiny to ensure that the time is sufficient to eat a regular meal under the circumstances presented");
>
> (c)   "The period involved is not just a short break for snacks and/or coffee but rather is a break to eat a full meal."  The meal period comes at a time of the day/shift that meals are normally eaten, and occurs with no more frequency than is usual;
>
> (d)   There is an agreement (*e.g.*, a CBA) between the employees and employer that the period of less than 30 minutes is sufficient to eat a regular meal.
>
> (e)   Applicable state or local laws do not require meal periods in excess of the 20 minute period.

*DOL Field Operations Handbook,* Section 31b23, Meal Periods of Less than 30 Minutes.

The record  is replete with evidence that Plaintiffs and Opt-Ins consistently received a 20

minute meal period for their benefit.  On balance, Plaintiffs and Opt-Ins were not interrupted

during their meal breaks and had sufficient time to eat a full meal if they wished.[110]  For

example, Named Plaintiff Grayer testified:

```
23        Q.   Your coworkers working the same shift as you,
24   are they generally going out to the car for their
25   break, or does each person do their own thing?

 1        A.   Everybody pretty much does their own thing.   [111]
```

---

[110] *See, e.g.,* Roth Dep. at 57:17-22; DeCapito Dep. at 94:5-6; 94: 7-12; Crites Dep. at 73:6-10;78:11-15; Demchak Dep. at 54:15-16; Morton Dep. 22:18-25:3.
[111] Grayer Dep. at 75:23-76:1.

Similarly, Named Plaintiff Morton testified:

```
15       Q.    Okay.  So that 15 minutes, flexibility,
16   you can do whatever you really want to do during that
17   time?
18       A.    Correct.
19       Q.    No one is dictating what you do during
20   that break?
21       A.    Correct.
```
[112]

and

```
1       Q.    Okay.  So you can do whatever you want
2   during that break?
3       A.    You can do whatever you want, both breaks.
```
[113]

Opt-In Plaintiff Rebecca DeCapito testified in similar fashion:

```
11       Q.    And so staying on the property, but you
12   could do -- you can go out and smoke a cigarette or
13   you can go to one of the breakrooms --
14       A.    Yes.
15       Q.    -- or you could do anything else?
16       A.    Yeah.
17       Q.    You weren't required to be in a certain
18   place during your break?
19       A.    No.
```
[114]

Similarly, in determining if a meal break is compensable time worked, the Sixth Circuit looks at (1) whether the employee is engaged in the performance of any substantial duties during the meal period, which means "giving up a substantial measure of his time and effort; and (2) whether the employer's business regularly interrupts the employee's meal period to the degree that the meal period is primarily for the employer's benefit. *Ruffin,* 775 F.3d at 811-813.

---

[112] Morton Dep. at 23:15-21.
[113] Morton Dep. at 25:1-3.
[114] DeCapito Dep. at 119:11-19.

The court found that the guards performed no substantial job duties during their breaks, were rarely interrupted, if ever, by emergency calls and spent their "mealtime adequately and comfortably." *Id.* at 815.  Specifically, the court held that "plaintiffs spend their meal periods doing exactly what one might expect an off-duty employee to be doing on a meal break: eating, socializing, reading, surfing the Internet, and conducting personal business on their smartphones." *Id.* at 814; *see also*, *Myracle v. Gen. Elec. Co.*, 1992 WL 699863, *5-6 (W.D. Tenn Dec. 1, 1992) aff'd, 33 F.3d 55 (6th Cir. 1994) (20 minute unpaid meal break was found a bona fide meal break where facts showed plaintiffs were generally free to do whatever they chose with their meal period and occasional interruptions for work-related reasons did not automatically provide a right to compensation).

Here, as in *Ruffin*, the record is equally clear that, during their meal break, Plaintiffs and Opt-Ins ate, took walks, socialized with co-workers, read books, talked on the phone, checked personal emails, played games, smoked cigarettes, went outside to their car, and even drove to the local Circle K.[115]  Named Plaintiff Brian Morton, testified that during his breaks, he eats a snack, takes a nap "or [does] whatever [he wants] to do."[116]  Opt-In Roni Jo Miller's activities during her breaks varied depending on if she wanted to socialize.[117]

Even though some Opt-Ins testified that at times they may have missed some or all of a meal break, they admitted they never notified their supervisor of the missed time.[118]  Some Opt-Ins simply took their meal break at a later time.[119]  Whereas others, like Opt-In Mancini, failed to

---

[115] Rice Dep. at 45:8-46:23; Crites Dep. at 76:13-25; Jackson Dep. at 138:32-139:5; Mancini Dep. at 67:1-9.
[116] Morton Dep. at 114:8-23; 115:13-22.
[117] Roni Jo Miller Dep. at 78:9-79:9.
[118] *See, e.g.,* Demchak Dep. at 53:23-54:14.
[119] *See, e.g.,* Mancini Dep. at 79:5-16 (when Mancini had to fix a part during his break period because a machine was down, he would take his full break at a later time); Rice Dep. at 43:16-24 (if she left late for a break, she would still take the full amount of time for her break); Roth Dep. at 72:10-73:8.

- 20 -

report a missed meal break because "it wasn't a big deal.  Because we could still eat while we were talking."[120]

Because Plaintiffs were compensated for a bona fide meal period, which Kennametal was not obligated to do, the shift overlap can rightfully be offset by the compensated meal period. *Ruffin, et al. v. MotorCity Casino,* No. 12-cv-11683, 2014 WL 11309796 (E.D. Mich. March 10, 2014), *aff'd* 775 F.3d 807, 811 (6th Cir. 2015) (20 minute paid meal period off-set plaintiffs' time spent attending unpaid, but compensable roll-call meeting, and therefore plaintiffs not entitled to relief on their overtime claim); FLSA § 207(h)(2) and (e)(5-7).

### 4.	The Unpaid Break Did Not Violate The FLSA

Plaintiffs cannot meet their burden to show that the unpaid break violated the FLSA. *Herman v. Palo Group Foster Home, Inc.*, 183 F.3d 468, 472 (6th Cir. 1999).

The regulations define compensable rest periods as those running between 5 minutes *to about 20 minutes.*  29 C.F.R. § 785.18 (emphasis added).  Courts routinely have held that 29 C.F.R. § 785.18 "does not state that 20-minute rest breaks are necessarily compensable" and that the regulation's use of the phrase "about 20 minutes" "indicates to the court that the test is a flexible one."  *Garcia v. Tyson Food*, 766 F. Supp.2d 1167, 1183 (D. Kan. 2011); *see also Mitchell v. Greinetz*, 235 F.2d 621 (10th Cir. 1956) (compensability of rest periods is determined on a case by case basis and is primarily focused on whether the break time is spent predominantly for the employer's or employee's benefit—not necessarily the time allotted for the break).  Plaintiffs cannot cite any binding precedent finding that a 20-minute unpaid break violates the FLSA.

---

[120] Mancini Dep. 82:12-17.

And, as with their meal break, Plaintiffs and Opt-Ins admit that they were free to use the 20 minute break period as they wished and it was for their own benefit.  Indeed, Plaintiffs and Opt-Ins testified that they used the break for their own benefit in the following ways:

- By eating and socializing in the second floor cafeteria[121]
- By leaving the premises and driving to a convenience store or other destination[122]
- Would take breaks in their car[123]
- By smoking cigarettes/cigars[124]
- Reading a book[125]
- Spend breaks at home[126]
- Spend breaks napping[127]
- Playing on their phone[128]
- Played puzzles[129]

Plaintiffs' and Opt-Ins' testimony regarding why they failed to notify their supervisors of any some or all missed breaks further supports the contention that the break was for their own benefit.  For example, Opt-In, Rosemary Rice, did not report her missed break to anyone at Kennametal because it was "nobody's concern" but hers.[130]

---

[121] Crites Dep. at 65:1-7; 65:15-17; 67:21-25; 69:20-25; 71:1-2; Farmwald Dep. at 35:25-36:3; 79:1-4; 79:14-19; 91:25-92:2; James Dep. at 79:6-12; 79:19-80:9; 83:16-23; Miller Dep. at 73:1-18; 78:9-79:9; Roth Dep. at 50:12-15; 51:16-17; 52:21-55:4; Shipman Dep. at 55:2-8

[122] Crites Dep. at 74:5-17; 76:13-25; Farmwald Dep. at 80:13-15; 80:22-81:3; Gilmore Dep. at 69:25-71:8; Ritter Dep. at 40:20-41:2; Shipman Dep. at 20:21-21:8; 62:6-19.

[123] Crites Dep. at 74:5-17; 76:13-25; 79:7-11; Farmwald Dep. at 80:13-15; 80:22-81:3; Gilmore Dep. at 69:25-71:21; Grayer Dep. at 60:15-61:1; Mancini Dep. at 61:19-25; Miller Dep. at 78:9-15; Morton Depo. at 114:8-14; 115:13-117:24; Ritter Dep. at 37:17-39:7; 40:20-41:2; 42:25-43:7; Roth Dep. at 50:12-15; 51:16-17; 52:21-55:4; 69:23-70:5; Shipman Dep. at 60:8-11; 60:25; 61:15-19.

[124] Crites Dep. at 74:5-17; 76:13-25; 79:7-11; DeCapito Dep. at 86:23-88:13; 89:23-91:7; 93:4-22; Gilmore Dep. at 71:9-21; Grayer Dep. at 60:15-61:1; Miller Dep. at 52:10-53:24; 54:7-56:20; 62:7-63:5; Ritter Dep. at 37:17-39:7; 40:20-41:2; 42:25-43:7.

[125] Demchak Dep. at 49:24-50:1; 52:2-13; 53:5-7; Farmwald Dep. at 35:25-36:3; 79:1-4; 79:14-19; 91:25-92:2; Grayer Dep. at 60:15-61:1; Roth Dep. at 70:16-19; 71:16-21;

[126] Miller Dep. at 52:10-53:24; 54:7-56:20; 62:7-63:5.

[127] Morton Depo. at 114:8-14; 115:13-117:24.

[128] Gilmore Dep. at 71:9-21; Jackson Dep. at 138:23-140:2

[129] Jackson Dep. at 138:23-140:2.

[130] Rice Dep. at 44:11-20; 48:18-23.

```
11        Q.   So tell me what happens if there's a day
12   when you miss a break.
13        A.   Life goes on.
14        Q.   Do you tell anyone you missed the break?
15        A.   No.
16        Q.   Why not?
17        A.   It's nobody's concern but mine.
18        Q.   So you don't think it's important to tell
19   your supervisor that you missed a break?
20        A.   No.
```

For the foregoing reasons, consideration of this factor confirms that Plaintiffs' claims are not appropriate for collective treatment.

## B.     The Viability Of Each Plaintiff's And Opt-In's Claims Depends On His Or Her Individual Factual Circumstances And Employment Settings

When evaluating whether plaintiffs are similarly situated, courts must consider the factual and employment settings of the plaintiffs. *Frye v. Baptist Mem. Hosp., Inc.*, No. 07-2708, 2010 WL 3862591 , *3 (W.D. Tenn. Sept. 27, 2010), *aff'd* 495 App'x 669, 671-72 (6th Cir. 2012). Even assuming that Plaintiffs could show that Kennametal had a company-wide policy or practice that caused the Orwell workers to not be paid for all hours worked (which they cannot), the analysis of the viability of each Plaintiff's and Opt-In's claim will be individualized because of their different employment experiences and work conditions. Courts consider such things as whether Plaintiffs had differing (1) jobs; (2) salaries [overtime, shift premium]; (3) supervisors; and (4) schedules. *White,* 2011 WL 1883959, at *6.

Here, there is material and substantial disparity within the proposed collective with respect to job duties, wages, overtime hours, supervisors, schedules, and circumstances relating to breaks.  In analyzing this case, the court will have to consider 12 departments and sub-departments, over 20 job positions, and the operation of at least 19 different machines.  Trial of the proposed collective action would require testimony from at least 29 department managers,

supervisors and leads.  The Opt-Ins' deposition testimony and Questionnaire[131] answers

demonstrate the various differences between each Opt-Ins day-to-day work experience, job

duties, supervisors and schedules.

     1.    **Comparison Of Opt-Ins**

**Opt-In Plaintiff Anthony Mancini.**  Mancini has been a Machinist in the Tool Room

since June 2014.[132]  Mancini repairs the broken parts of the facility machines, either by using an

existing blue print of the part, or if one is not available, engineering the part from scratch.[133]  He

worked 1st shift from June 2014 until March 2017, when he was placed on 3rd shift.[134]  Mancini

is the only Machinist on the 3rd shift and reports to manager, Will Seger.[135]  However, because

his manager works a different shift, if Mancini has a question he consults the 3rd shift

supervisor, Tim Pleso, or Maintenance Lead, Jeff Takacs.[136]

     Prior to becoming a Machinist, Mancini worked in Periphery Grind setup for

approximately eight years.[137]  While in Periphery Grind, he had three managers, Jim Kalal, Dave

Puckett and Joe Ballast.[138]  He also had at least three supervisors, Dave Stiles, Karen Lopez, and

Kevin Durenski and two leads, Pete Cole and Dave Bell.[139]

     For half of his breaks, Mancini spends his time in his truck, sometimes eating a snack.[140]

Other times, he stays in the Tool Room office, uses the restroom, plays on his phone and eats a

---

[131] As part of discovery, Kennametal served upon Opt-In Plaintiffs a fifteen (15) question Questionnaire, mostly "yes", "no" or "sometimes" questions, relating to the shift overlap, breaks and compensation.
[132] Mancini Dep. at 19:5-13.
[133] Mancini Dep. at 41:15-42:1.
[134] Mancini Dep. at 21:13-18.
[135] Mancini Dep. at 20:15-19; 21:19-20.
[136] Mancini Dep. at 32:13-33:4; 20:24-21:4.
[137] Mancini Dep. at 19:3-5.
[138] Mancini Dep. at 26:13-27:7; 27:20-28:4; 28:19-22.
[139] Mancini Dep. at 23:24-25:22; 30:2-14.
[140] Mancini Dep. at 61:15-25.

snack or sandwich.[141]  Yet at other times, he has checked his personal email using the work computer in the office.[142] And still sometimes, he has walked upstairs to the cafeteria.[143]

**Opt-In Plaintiff Crystal Crites.**  In contrast, Crites described four distinct jobs during the relevant time period, which include Vaqua, KBU, Rodding and Honing Mill 1.[144]  Each job was different, in differing departments, and required its own specific training.[145]

In her position as Honing Mill 1, her lead is Dave Bell, but she has not had a supervisor on her shift for over a year.[146]  While she ran the KBU, her lead was Chris Kovach, and her supervisor was Sue Roland for a period of time.[147]  When she worked Vaqua, Crites believed a woman named Betty (LNU) was her supervisor.[148]

Crites worked the 1st and 2nd shift during the relevant time period, and unlike Mancini she worked 12-hour shifts on the weekends.[149]  When she worked Vaqua, KBU, and Rodding, she was in Group 1 breaks and always spent both breaks in the second floor cafeteria.[150]  When she first started in Mill 1 she decided to move to Group 2 breaks so that she could take her break with her boyfriend.[151]  Sometimes during the break period, Crites and her boyfriend would drive to the Circle K to grab coffee or something to eat.[152]

**Opt-In Plaintiff Sandra Jackson.**  And still different is Opt-In Sandra Jackson, who has worked on 2nd shift, and had held the same position—Top and Bottom Operator—for the last 22

---

[141] Mancini Dep. at 66:8-14.
[142] Mancini Dep. at 67:1-9.
[143] Mancini Dep. at 75:20-22; 76:3-5.
[144] Crites Dep. at 48:24-49:3; 19:2-8; 27:10-19; 42:14-18.
[145] *Id.*
[146] Crites Dep. at 47:2-10; 47:19-23.
[147] Crites Dep. at 50:2-18.
[148] Crites Dep. at 49:10-24.
[149] Crites Dep. at 22:9-16.
[150] Crites Dep. at 65:1-7; 65:15-17: 69:2-25; 70:19-71:5.
[151] Crites Dep. at 73:17-74:6.
[152] Crites Dep. at 76:13-25.

years.[153]  Jackson has had the same lead, Penny Lenhart, for a "long time."[154]  Jackson spends

her breaks in a small sitting section in the hallway.[155]  She always takes her breaks in the same

spot, and never deviates.[156]  During her breaks she does puzzle books, plays solitaire or talks

with family members on the phone.[157]

       **2.      Not All Opt-Ins Were Subject To The Shift Overlap**

As discussed in Section IV(A)(1), Plaintiffs are unable to prove that all Plaintiffs and

Opt-Ins were subject the shift overlap that is the basis for their off-the-clock claims.

       **3.      Plaintiffs And Opt-Ins Had Diverse Job Duties**

The numerous positions held by the Opt-Ins include, but are not limited to:

Press Set Up[158]
Press Operator[159]
Tip Setter[160]
Periphery Grinder Set Up[161]
Periphery Grind Computer Numerical Control Machinist[162]
Top and Bottom Operator[163]
Honer Mill 1[164]
Furnace Operator Mill 1[165]
Furnace Production Operator[166]
PVD Set Up[167]
CVD Ken Blaster[168]
Vaqua[169]
Rodding[170]

---

[153] Jackson Dep. at 29:17-30:7; 98:15-18.
[154] Jackson Dep. at 96:20-24; 97:23-25.
[155] Jackson Dep. at 138:25-139:5.
[156] Jackson Dep. at 139:13-19.
[157] Jackson Dep. at 138:23-139:5.
[158] Ritter Dep. at 17:5-11; 18:1-2.
[159] Morton Dep. at 76:8-11.
[160] Roth Dep. at 46:11-19.
[161] Mancini Dep. at 18:13-19:8.
[162] Grayer Dep. at 23:10-23.
[163] Jackson Dep. at 29:17-30:7
[164] Crites Dep. at 42:14-16.
[165] Morton Dep. at 70:22-77:8.
[166] Anita White, Answer to Interrogatory No. 1.
[167] Demchak Dep. at 33:6-34:12.
[168] Crites Dep. at 21:25-22:4.
[169] Crites Dep. at 19:6-8; 22:24-23:1.
[170] Crites Dep. at 27:13-19; 33:17-22.

> Sinter Separator[171]
> Die Crib Attendant[172]
> Machinist[173]
> Certification Inspector[174]

Plaintiffs uniformly testified that all of the positions at Kennametal are different from one another.[175]  Additionally, as set forth in detail *supra*, each position performed different job duties and required distinct skill sets.  Some Opt-Ins held the same position throughout the relevant time period while others held two, three or even four different positions.[176]  Named Plaintiff Robert Grayer runs four different machines at one time.[177]  The differing job duties and machines impacted whether an Opt-In took their break at the scheduled time and to which supervisor or lead they would have reported any missing time.

### 4. The Salaries, Overtime, And Shift Premium Received By Opt-Ins Varied

Plaintiffs' and Opt-Ins' salaries, amount of overtime, and shift premium pay varied.  For example, Opt-In Plaintiff Ritter received a shift premium when he worked the 2nd and 3rd shift but not when he worked the 12 hour shift.[178]  Other Opt-Ins received shift premium payment for only a certain period of time.[179]  It is impossible to list the amount of overtime worked for each of the 193 Opt-Ins and Named Plaintiffs, as each one worked varying amounts of overtime at different times during the relevant period.

---

[171] Morton Dep. at 78:6-10.
[172] James Dep. at 49:7-20.
[173] Mancini Dep. at 41:15-24.
[174] Roth Dep. at 38:3-6; 38:23-39:1.
[175]*See, e.g,* Jackson Dep. at 27:11-13; 71:18-72:3 (furnace operator is very different from precision grinding); *Id.* at 84:24-85:12; DeCapito Dep. at 47:23-48:1 (job duties of press operator are different than job duties of press setup); Ritter Dep. at 21:18-22:2 (job duties of press operator and grinder different); Morton Dep. at 78:8-79:12; Grayer Dep. at 78:2-79:4 (honing different work than periphery grinding).
[176] *See, e.g.* Crites Dep. at 48:24-49:3(Crites worked Vaqua, KBU, Rodding and Mill 1 Honer during the relevant time period); Demchack Dep. at 33:6-34:12 (Demchak has worked setup in the PVD room since 1998).
[177] Grayer Dep. at 27:6-17; 28:13-29:5.
[178] Ritter Dep. at 52:23-53:7.
[179] *See, e.g.* William Miller Dep. at 24:22-25:13 (received shift differential for second 12 hour shift on Saturdays between January 2015 and June 2016)

### 5.    Each Opt-In Had Different Managers, Supervisors, And Team Leads

To analyze the factual circumstances surrounding each Plaintiff's and Opt-In's claims, the testimony of possibly twenty-nine (29) managers, supervisors and leads will have to be elicited.  Further, in some instances, the Opt-Ins did not have a supervisor or shift lead on their particular shift.[180]  Based only on the discovery obtained from some Opt-Ins, the list below provides the name of managers, supervisors, and leads, which the Named Plaintiffs and Opt-In Plaintiffs worked under, in one or more of their positions, during the relevant time period:

| DEPARTMENT MANAGERS | SUPERVISORS | TEAM LEADS |
|---|---|---|
| Jim Kalal | Dave Stiles | Pete Cole |
| Dave Puckett | Karen Lopez | Dave Bell |
| Joe Ballast | Kevin Dimenski | Trent Carson |
| Mitch Handler | Joellen Wensel | Steve Corson |
| Dave Miller | Kelly Brown | Penny Lenhart |
| Sherri Pennington | Greg James | William Miller |
| Ben Rogers | Todd Armstrong | Chris Kovach |
| | Dennis Star | Michael Church |
| | Bryan Demay | |
| | Tim Hopes | |
| | Mike Lippert | |
| | Sue Roland | |
| | Betty (LNU) | |
| | Mark Frerichs | |

If this matter were to proceed to trial, Kennametal's defenses would require testimony from all of these management personnel, and more.  For the foregoing reasons, consideration of this factor confirms that Plaintiffs' claims are not appropriate for collective treatment.

---

[180] *See e.g.* Crites Dep. at 47:19-48:6 (no current supervisor); Demchak Dep. at 41:13-17 (no shift lead).

**C.**     **Kennametal's Defenses To Each Plaintiff's And Opt-In's Claims Must Be Litigated And Analyzed On An Individual Basis**

Plaintiffs and Opt-Ins are not similarly situated because Kennametal raises defenses to each Plaintiff's and Opt-In's claims that need to be litigated on an individualized basis. Courts regularly grant decertification in cases based on the existence of defenses that must be adjudicated on an individualized basis. *See, Espinoza v. Cty. of Fresno*, 290 F.R.D. 494, 506-07, 2013 BL 80154, at *13-14 (E.D. Cal. 2013) (decertification granted based on defendant's use of *de minimis* defense); *Camilotes v. Resurrection Health Care Corp*., 286 F.R.D. 339, 352-53, 2012 BL 259293, at *12 (N.D. Ill. 2012) (granting decertification where determination of defendants' knowledge of violations required individualized discovery). Moreover, not all of the defenses raised will pertain to all class members, it will vary as to the individual Plaintiff.

Kennametal's defenses that need to be analyzed on an individualized basis include:

- Any alleged overtime owed is offset by payment received for non-compensable meal periods and shift premiums.

- Time allegedly worked was without Kennametal's actual or constructive knowledge;

- Named and Opt-In Plaintiffs' failed to follow established procedures for reporting missed break or meal period time; and

- The amount of overtime allegedly not compensated is *de minimis*.

Because of the individualized nature of their claims, and defenses, allowing this to proceed as a collective action would impose extraordinary burdens on the Court and on a jury. The claims at issue have to be addressed not only on a worker-by-worker basis, but on a shift-by-shift basis.  Determinations have to be made countless times as whether each worker, on any particular shift, received a paid or unpaid break, missed all or part of their break(s), failed to follow established practices and procedures for reporting missed break times, worked a *de minimis* amount of overtime, were paid for non-compensable meal periods and for premium

shifts or days, and could be subject to an offset if an unpaid break was missed or interrupted but a paid break during the same shift was uninterrupted.  This case would essentially have to be divided into "mini-trials," which is inconsistent with the goals of FLSA collective actions.

> **1.    The Twenty (20) Minute Shift Overlap Is Offset By The Paid Meal Period And Shift Premium Pay Must Be Determined On An Individualized Basis**

As a defense, Kennametal is entitled to offset the paid meal breaks and shift premium payments against the shift overlap.  Sixth Circuit precedent allows paid bona fide meal periods, otherwise not compensable, to be offset against alleged unpaid overtime.  *Ruffin,*. 2014 WL 11309796 (6th Cir. 2015) (20 minute paid meal period off-set plaintiffs' time spent attending unpaid, but compensable roll-call meeting, and therefore plaintiffs not entitled to relief on their overtime claim).

Additionally, the FLSA allows for certain premium payments, including premium shift payments to offset alleged unpaid overtime.  FLSA § 207(h)(2) and (e)(5-7).  For example, if an employee is paid a premium rate for working more than eight hours per day under § 207(e)(5) or working Saturdays, Sundays, holidays, or regular days of rest under § 207(e)(6) then, under § 207(h)(2), that payment may be credited toward any unpaid overtime owed.  29 U.S.C.A. § 207.  As stated *supra*, Kennametal paid Plaintiffs and Opt-Ins for a bona fide non-compensable meal break.  Moreover, various Opt-Ins were paid a premium shift rate for certain hours and days of work.  However, whether and to what extent each Plaintiff and Opt-In received a bona fide meal period and/or a shift premium requires an individualized assessment (daily and weekly).

## 2. Kennametal's Knowledge, Plaintiffs Failure to Follow Procedures, And *De Minimis* Time Must Be Determined On An Individualized Basis

Some Opt-Ins were never interrupted during their break or meal period and/or never missed a break or meal period.[181] Some Opt-Ins who missed time during their meal or break periods, explained that they did not report the missed time to their supervisors because, among other reasons, the time was so minimal.[182] Others explained that if work or discussions with their supervisors carried into their break or meal time, the supervisor allowed them to extend the break or meal time.[183] Still, some Opt-Ins who missed time during their meal periods or breaks, did report the missed time to their leads or supervisors.[184]

To determine whether Kennametal had actual or constructive knowledge of the Opt-Ins missed break or meal period times, every Opt-In who claimed to have missed time will have to be analyzed on an individual basis. Each manager, supervisor, and/or lead named by the Opt-Ins will have to testify as to each alleged instance of missed time. Not only will there need to be individualized testimony on whether the manager, supervisor, and/or lead was aware and when it occurred, but if the Opt-Ins used the established procedures for reporting missed time and how much time was missed, so that it can be determined if the time was *de minimis*.

## 3. Plaintiffs And Opt-Ins Credibility Must Be Determined On An Individualized Basis

Because Plaintiffs have no common evidence, the issues in this case necessarily involve issues of credibility. Whether and to what extent Plaintiffs and Opt-Ins took their breaks and what transpired during those breaks must be extrapolated through testimony. As such,

---

[181] *See, e.g.,* Jackson Dep. at 145:22-25; Roth Dep. 57:23-25; 58:1-6; 77:7-9; William Miller Dep. at 60:6-8.

[182] *See, e.g.* William Miller Dep. at 56:25-57:21(on rare occasions lost track of time but did not report it because it was not big issue); Grayer Dep. at 80:19-81:4.

[183] *See, e.g.,* Jackson Dep. at 144:20-145:5.

[184] *See, e.g.* Bobbie Jo Blackson, Tamala Brandon, Kathleen Fularz, Crystal Goberish, Kristen Pawcio, Carol-Anne Finch, Gail Hightree, Laura Ishee, Daryl Lonsinger, William Strang, Edward Ziegler Valerie Gombosz Questionnaire Answers # 10 and 12.

Kennametal should be entitled to cross-examine Plaintiffs and Opt-Ins and have the ability to impeach the Plaintiffs and Opt-Ins with their testimony.  This cross-examination might weigh heavily in the jury's mind when determining whether the Plaintiff/Opt-In was being truthful.  Further, whether a Plaintiff or Opt-In reported any missed breaks to a supervisor could involve credibility determinations regarding the Plaintiff/Opt-In and supervisor.

For the foregoing reasons, consideration of this factor confirms that Plaintiffs' claims are not appropriate for collective treatment.

**D.      Fairness And Procedural Factors Dictate That The Class Be Decertified**

Permitting this case to proceed as a collective would be neither efficient nor fair to Kennametal or the Opt-Ins.  Given the nature of Plaintiffs' claims and Kennametal's defenses, common proof is not available, which means that Plaintiffs' claims and Kennametal's defenses must be analyzed individually as to each Plaintiff and Opt-In.  Trying this case on a collective basis would not permit Kennametal to "dispute allegations made by claimants or to raise substantive defenses."  *Gates v. Rohm & Haas Co.*, 655 F.3d 255, 266 (3d Cir. 2011).  Whether any of the other Opt-Ins who did not participate in discovery would testify similar to Plaintiffs or provide completed different testimony, and whether Kennametal would have a defense as to each individual, could only be determined by taking testimony and evidence from *each* Opt-In and permitting Kennametal to contest each individual's claims and present defenses specific as to each individual.  As such, there is no way, consistent with Due Process, to adjudicate the claims of all Plaintiffs and Opt-Ins based on a subset.

Moreover, any efficiency gained through bringing this action collectively is outweighed by the substantial likelihood of individual mini-trials and the risk of prejudice to both parties.  *Monroe v. FTS USA LLC*, 763 F. Supp. 2d 979, 996, (W.D. Tenn. 2011) (decertification denied where dividing class into hundreds of "mini-trials" inconsistent with goals of FLSA collective

actions), *aff'd in part*, 2016 BL 62349, at *6 (6th Cir. 2016). As stated *supra*, a jury would have to make individualized determinations as to each Plaintiff and Opt-In regarding each individual's work schedule, break schedule, and hours worked.

Furthermore, proof of damages in this case will be highly individualized, rending it nearly impossible to try this case as a collective. Because overtime calculations under the FLSA are made on a workweek basis, the jury would have to reconstruct each Opt-Ins daily and weekly work schedules to determine whether, and to what extent, he or she is entitled to overtime compensation on a given week. Because Plaintiffs and Opt-Ins shift schedules and hours worked vary significantly, this endeavor alone with render a collective trial unmanageable. *See England v. New Century Financial Corp.*, 370 F. Supp. 2d 504, 511 (M.D. La. 2005).

For the foregoing reasons, consideration of this factor confirms that Plaintiffs' claims are not appropriate for collective treatment.

## V. CONCLUSION

As discovery has uncovered, Plaintiffs cannot demonstrate Kennametal had a common policy that violated the FLSA. Plaintiffs and Opt-Ins have very different employment settings. Their job duties, supervisors, and schedules are distinct and numerous. The defenses which Kennametal asserts, lack of knowledge, *de minimis* time, failure to follow procedures and offset, require an individualized assessment of each Plaintiffs' factual circumstances, including testimony from over 29 managerial employees. And fairness and procedural considerations deem Plaintiffs' and Opt-Ins' claims inappropriate for collective treatment. For all these reasons, Plaintiffs are not similarly situated and therefore, Kennametal respectfully requests that the Court grant its Motion to Decertify the FLSA Collective Action, and dismiss the claims of all Opt-Ins without prejudice.

Dated: December 8, 2017                    Respectfully submitted,

                                              */s/James F. Glunt*
                                              James F. Glunt (*pro hac vice*)
                                              jglunt@reedsmith.com
                                              Gretchen Woodruff Root (*pro hac vice*)
                                              groot@reedsmith.com
                                              Robert J. Tyler III (*pro hac vice*)
                                              rtyler@reedsmith.com
                                              Raeann Traficante (*pro hac vice*)
                                              rtraficante@reedsmith.com
                                              Reed Smith LLP
                                              225 Fifth Avenue
                                              Pittsburgh, PA  15222
                                              Telephone:  412-288-4121/3883/4595
                                              Facsimile:  412-288-3063

                                              Christina E. Niro (0086272)
                                              cniro@frantzward.com
                                              Frantz Ward LLP
                                              200 Public Square, Suite 3000
                                              Cleveland, OH  44114
                                              Telephone:  216-515-1660
                                              Facsimile:  216-515-1650

                                              *Counsel for Defendant*

### Certification

       This case was set on the standard track, requiring memoranda of 20 pages or less.  The undersigned certifies that on December 6, 2017, Defendant filed a motion requesting an extension of the page limit to 35 pages.  [Dkt. No. 107].  Though the Court has not yet ruled on this motion, Defendant has adhered to the 35 page limit it requested.

                                              */s/ James F. Glunt*
                                            James F. Glunt

## <u>CERTIFICATE OF SERVICE</u>

The foregoing was filed electronically on December 8, 2017.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

*/s/James F. Glunt*
James F. Glunt (*pro hac vice*)
*Attorney for Defendant*